IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA § | |
| § | |
| v. § | EP-10-CR-1628-KC |
| § | |
| ARTICE LAMONT JACKSON, et al., § | |
| § | |
| Defendants. § | |
| § | |

### ORDER

On this day, the Court considered Defendant's Motion to Suppress Evidence and Statements and Supporting Memorandum, ECF No. 34 ("Motion"). For the reasons set forth below, Defendants' Motion is **GRANTED**.

**I.     BACKGROUND**

On April 14, 2010, Defendant Artice Lamont Jackson ("Defendant") was driving a vehicle with two passengers, Nicole Ralynn Jackson ("Nicole Jackson") and her boyfriend. Motion; *see also* Supplement and Timeline Ex. 1 ("Video"). Texas Department of Public Safety Trooper Melvin Allick II ("Trooper Allick") turned on his emergency overhead lights when Defendant, driving in the left lane, passed a sign stating that the left lane was to be used for passing only. Gov't's Resp. to Def.'s Mot. to Suppress Evidence 1, ECF No. 38 ("Response").

After explaining why he pulled Defendant over, Trooper Allick informed Defendant that he would issue a warning for the traffic infraction. *Id.* at 2. Thereafter, Trooper Allick questioned all three occupants of the vehicle about their travel plans and requested Defendant's license and registration. *Id.* Trooper Allick then asked Defendant to exit the vehicle and join

him in the patrol car. *Id.* Trooper Allick learned that the vehicle Defendant was driving was a rental car that was twelve days overdue. *Id.* at 3. Defendant informed Trooper Allick that he was unaware of the sign limiting use of the left lane to passing only. Video at 5:43.[1] Trooper Allick once again notified Defendant that he would issue a warning only. *Id*. at 7:03.

      Thereafter, Trooper Allick requested the vehicle's three occupants' criminal records after expressing concern for his safety. *Id.* at 8:20. After receiving the criminal histories of all three occupants, Trooper Allick returned to Defendant his driver's license and other documents and reiterated the warning, explaining the law concerning use of the left lane on highways. *Id.* at 13:44. Then, Trooper Allick asked Defendant whether he was carrying anything illegal, including narcotics. *Id.* at 14:06. After Defendant answered in the negative, Trooper Allick asked Defendant for consent to search the vehicle, which Defendant refused. *Id.* at 14:33.

      Trooper Allick proceeded to request backup and a K-9 dog sniffing unit, citing "a vehicle search refusal" as the cause. *Id.* at 14:50. Next, Trooper Allick called a colleague, Deputy George Johnson ("Deputy Johnson"), and informed him that he had a search refusal and that he needed Deputy Johnson there. *Id.* at 16:30. While waiting for Deputy Johnson to arrive on scene with the dog, Trooper Allick directed Defendant, Nicole Jackson, and her boyfriend to exit the vehicle and wait on the side of the highway. *Id.* at 17:00-18:00. After Deputy Johnson arrived, Trooper Allick explained that Defendant denied consent to search the vehicle, and that Defendant was "belligerent from the outset." *Id.* at 31:52. Deputy Johnson proceeded to take Defendant away from Trooper Allick's patrol unit, out of both video and audio range. *Id.* at 34:55.

---

[1]     All times cited by the Court are to the time shown on the police video of the traffic stop.

Throughout this time period, though partly inaudible, Defendant can be heard on the Video continuing to ask questions. *Id.* About ten minutes later, after Defendant signed a consent to search form, Deputy Johnson led his dog around the perimeter of Defendant's vehicle. *Id.* at 43:00-44:00.

After Deputy Johnson guided the dog inside the vehicle to the center console, Trooper Allick and Deputy Johnson performed a thorough search of the vehicle and all of its contents, including a purse in the rear seat and all suitcases and bags contained in the trunk. *Id.* at 44:50-51:00. Eventually, Trooper Allick recovered counterfeit travelers' checks and gift cards, and subsequently arrested all three occupants. *Id.* at 50:39, 1:07:00.

Defendant and Nicole Jackson have been indicted for possession of counterfeit securities, and conspiracy to possess counterfeit securities. *See* Indictment 1, ECF No. 20. The government contends that at some point prior to April 14, 2010, Defendant produced a number of counterfeit traveler's checks using a computer, and that he and Nicole Jackson passed and cashed some of these checks. *Id.* at 2. Defendant now moves to have this evidence suppressed on the grounds that the search was unlawful because his continued detention, after the issuance of a warning for the traffic offense, was unjustified. *See generally* Mot. Defendant seeks to suppress the fruits of this search, including subsequent statements and admissions in addition to the actual checks themselves. *See* Mot. 1.

The government has filed a Response to Defendant's Motion. *See* Resp. Defendant filed a joint Supplement and Timeline ("Supplement") in support of his original motion, containing, as an exhibit, a copy of a video recording of the traffic stop in question which was filmed by a camera installed in Trooper Allick's patrol car. *See* Suppl. 2, Video. The government filed a

final Reply after Defendants filed their Supplement.  *See* Reply, ECF No. 44.  On September 29, 2010, the Court held an evidentiary hearing concerning Defendant's Motion.

## II.   DISCUSSION

Because the Court finds that Defendant's prolonged detention was illegal, his consent was involuntary, and there was no probable cause to independently justify the search, the Court grants Defendant's Motion.  The Court addresses each of these issues in turn below.

### A.   Standard

The Fourth Amendment protects individuals from unreasonable searches and seizures.  U.S. Const. amend. IV; *United States v. Grant*, 349 F.3d 192, 196 (5th Cir. 2003).  "Traffic stops are considered seizures within the meaning of the Fourth Amendment." *Grant*, 349 F.3d at 196. Courts should analyze traffic stops, for Fourth Amendment purposes, under the standard set forth in *Terry v. Ohio*, 392 U.S. 1 (1968).  *See United States v. Pack*, 612 F.3d 341, 349-50 (5th Cir. 2010).  Applying the *Terry* framework, the Fifth Circuit has held that the legality of a traffic stop is tested with reference to two factors.  *Id.* at 350.  First, the court examines whether "the officer's decision to stop the vehicle was justified at its inception." *Id*.  This means that "an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." *United States v. Banuelos-Romero*, 597 F.3d 763, 766 (5th Cir. 2010).  Second, the court examines "whether or not the officer's subsequent actions were reasonably related in scope to the circumstances that caused him to stop the vehicle in the first place." *Pack*, 612 F.3d at 350.

While an officer's actions during the course of a traffic stop must be related to the reason for the initial stop, the officer may elect to prolong the stop and widen the scope of investigation

if "he develops reasonable suspicion of additional criminal activity" during the course of a legally-conducted stop. *Id.* Thus, if the officer develops this reasonable suspicion, "he may further detain its occupants for a reasonable time while appropriately attempting to dispel this reasonable suspicion." *Id.* This reasonable suspicion of additional criminal activity must be supported by articulable facts. *United States v. Gonzalez*, 328 F.3d 755, 758 (5th Cir. 2003). When making a reasonable-suspicion determination, the Fifth Circuit has said that courts "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing."[2] *Grant*, 349 F.3d at 197.

   B.     **The Initial Stop**

The first issue the Court considers is whether Trooper Allick had the requisite reasonable suspicion to stop Defendant on April 14, 2010. The Court has been unable to find any statute in Texas that prohibits traveling on the left lane of a highway. With this in mind and in reviewing the traffic stop made by Trooper Allick, the Court can only conclude that the applicable statute in this case requires motorists to "comply with an applicable official traffic control device."[3] *See*

---

[2] The Fifth Circuit has ruled that the facts giving rise to a reasonable suspicion of wrongdoing need not be limited to a single theory of what sort of criminal activity is afoot, such that any further investigative steps taken must be narrowly tailored to that specific theory. *See Pack*, 612 F.3d at 351. Rather, an officer may take steps to investigate a number of potential crimes that are reasonably consistent with the suspicious circumstances. *Id.*

[3] Despite the government's assertions, there is no general rule prohibiting driving in the left lane of an interstate highway without passing. Tex. Transp. Code § 545.051, cited by the government in this connection, *see* Resp. 4, simply requires driving on the right *half* of a two-way roadway, which would permit driving in the left lane of a double-lane single-direction highway, as that lane would be within the right half of the overall dual-highway. Moreover, § 545.051(c) states that an "operator on a roadway having four or more lanes for moving

Tex. Transp. Code § 544.004.  In this case, Defendant drove past such a device, specifically a sign, that stated that the left lane is to be used for passing only, thereby prohibiting general travel in the left lane of the highway.  Resp. 1-2.  At the relevant time, Defendant was driving in the left lane, in potential violation of the law.  This could serve as the basis for reasonable suspicion sufficient to stop Defendant.

However, it is unclear whether Trooper Allick could have possessed reasonable suspicion given how quickly he pulled Defendant over after passing the sign.  Trooper Allick followed Defendant for approximately one mile before Defendant passed the sign.  Video at 1:39.  Then, he pulled Defendant over, at most, six seconds after passing the sign.  Video at 0:29 (passed sign); Video at 0:35 (Defendant pulls over).  That Trooper Allick pulled Defendant over only six seconds after passing the sign, having already followed the car for one mile, is suspect, and calls into question the basis for the stop.  Six seconds is barely enough time for the driver to correct his position to comply with the requirements of the sign.  However, regardless of whether the stop was legal, Defendant's continued detention was not.

    **C.**    **Continued Detention**

---

vehicles and providing for two-way movement of vehicles may not drive left of the center line of the roadway [with certain exceptions]."  This further emphasizes the fact that § 545.051 only requires vehicles on a two-way road to remain on the right half of that road, and not within any particular lane on the right half of that road.

Though not cited by the government, the actual provision of state law applicable to this traffic stop is Texas Transportation Code § 544.011, which provides that "[i]f, on a highway having more than one lane with vehicles traveling in the same direction, the Texas Department of Transportation or a local authority places a sign that directs slower traffic to travel in a lane other than the farthest left lane, the sign must read 'left lane for passing only.'"  Furthermore, § 544.004 requires motorists to "comply with an applicable official traffic control device."

After stopping Defendant and informing him on multiple occasions that he would issue a warning only, Trooper Allick requested criminal records for Defendant, Nicole Jackson, and her boyfriend. Video at 8:20. Trooper Allick told Defendant that obtaining the criminal records was necessary for his safety. *Id.* at 9:00. However, given that Trooper Allick had already decided and communicated to Defendant at least twice that he would let him off with a warning, there appears to be little actual concern for his safety. If Trooper Allick truly intended on issuing a warning only, he would have issued the warning and left[4] in a shorter time than was spent waiting for the results of the criminal history search, and with small threat to his safety after leaving the scene. Mentioning officer safety therefore strikes this court as pretextual and reveals Trooper Allick's true intention to detain Defendant further whether cause existed or not.

Defendant contends that there was insufficient reason to prolong the stop at that point, making the continued detention unlawful.[5] Suppl. 7-8. This, he argues, makes the subsequently discovered evidenced tainted and subject to suppression. *Id.* at 9. The government responds by arguing that there are seven particular reasons, grounded in articulable facts, which gave the officer reasonable suspicion of other criminal activity, justifying a continuation of the stop in order to investigate further. *See* Resp. 5-6. These reasons are: 1) that Defendant came to a "slow

---

[4] Trooper Allick would have left after issuing the warning because he had concluded dealing with the traffic infraction and no further reason for detention existed.

[5] Defendant also objects to the officer's decision to question the driver and passengers regarding collateral matters, such as travel plans or destinations, during the initial part of the traffic stop. *See* Def.'s Mot. 4. Settled precedent, however, states that such questioning in the context of a simple traffic stop is acceptable under the Fourth Amendment. *See United States v. Zavala*, 541 F.3d 562, 576-77 (5th Cir. 2008).

roll" stop; 2) "[a]ggressive verbal on the part of" Defendant; 3) inconsistent statements made by Defendant and Nicole Jackson; 4) Nicole Jackson's lack of knowledge regarding the trip itinerary; 5) the other passenger's lack of knowledge regarding the same; 6) that the rental car's overdue status; and 7) Defendant's nervousness. *Id.* Accordingly, the Court will evaluate the particular reasons given and the totality of the circumstances of the stop to ascertain whether the officer had legitimate grounds to prolong it.

First, regarding the alleged "slow roll" stop, the Court finds that Defendant slowed his car and stopped it in an apparently normal and reasonable fashion, and that it is erroneous to characterize it as unusually slow or suspicious. On the video, it appears that Defendant stopped his car within twenty seconds of the police officer giving an indication to pull over, which is equal to or less than the time taken by most other motorists whose traffic stops were recorded on the same video. *See generally* Video. Furthermore, at the suppression hearing, Trooper Allick admitted that after viewing the video, Defendant's rate of stop was insignificant. Hearing Tr., 7:9-11, Sept. 29, 2010. Accordingly, the Court concludes that there is no basis for finding that Defendant engaged in a "slow roll" stop, or that his manner of stopping the car was otherwise suspicious.

Second, regarding Defendant's allegedly aggressive verbal behavior, the Court concludes that this, too, simply is not so. Upon reviewing the dialogue contained on the video, it is clear that Defendant's verbal behavior was not aggressive between the initial stop and the time that he was told that he was not free to go, approximately fourteen minutes, despite completing the business of the traffic infraction. *See* Video. Instead, Defendant was generally courteous and responsive throughout this period of time. Any later signs of verbal aggression on Defendant's

part are not relevant to this analysis because they had not yet occurred by the time the decision was made to prolong his detention. Thus, the government's second reason is also devoid of factual support.

Third, the inconsistencies in the statements of Defendant and Nicole Jackson do not rise to the level of suspicious. The main inconsistency at issue concerns the familial relationship between Defendant and Nicole Jackson. Nicole Jackson stated that Defendant was her cousin, while Defendant stated that Nicole Jackson was actually his former sister-in-law. *See* Resp. 2. The Fifth Circuit, however, has indicated the use of inconsistent or generalized terms to describe such complicated family relationships is not grounds for suspicion. *See United States v. Jones*, 234 F.3d 234, 237-38 (5th Cir. 2000) (finding no reasonable suspicion to prolong a traffic stop despite the fact that one passenger identified the other as his "uncle," while the second passenger identified the first as his son-in-law's brother, not his nephew). Accordingly, this fact does not provide support for the continuation of the stop.

For the fourth and fifth reasons, the government cites the lack of knowledge of the trip itinerary exhibited by Nicole Jackson and her boyfriend. False, contradictory, implausible or illogical statements in response to police questions about a trip itinerary may be deemed suspicious, and provide partial support for a decision to prolong a traffic stop. *See United States v. Rodriguez-Flores*, 249 F. App'x 317, 322 (5th Cir. 2007) (finding that "outright lies" told by a driver concerning his itinerary, arrest record, and border crossing activity would support a finding of reasonable suspicion, but that "not-very-inconsistent inconsistencies" would not provide such support); *United States v. Henry*, 372 F.3d 714, 715-16 (5th Cir. 2004) (finding reasonable suspicion to continue detention where defendant exhibited extreme nervous behavior, he was

unable to detail his travel plans, passengers were nervous and lacked even rudimentary knowledge about purpose of the trip, defendant wore baggy clothes, and officer discovered fake identification protruding from defendant's sock after obtaining permission to pat-down).  The government avers that Nicole Jackson did not provide any details regarding the trip itinerary when the police officer questioned her on the subject, and instead indicated that "the trooper should ask the driver these questions."  Resp. 2.  The other passenger similarly responded.  *Id.*  The Court finds that this level of ignorance or refusal to discuss details does not amount to a particularly suspicious circumstance.  There is a meaningful distinction between "outright lies" and a refusal to answer or lack of knowledge about an itinerary, and the government can point to no outright lies, inconsistencies, or implausible statements made by any of the passengers in Defendant's car.  Accordingly, these responses are not comparable to the "outright lies" which provided grounds for reasonable suspicion in *Rodriguez-Flores*, and thus cannot support a decision to prolong the stop.  Furthermore, even if she had made inconsistent statements about the travel itinerary as Trooper Allick alleges, those statements themselves do not constitute reasonable suspicion.  *See United States v. Cota-Lopez*, 358 F. Supp. 2d 579, 604 (W.D. Tex. 2002).  Lastly, by deeming suspicious a refusal to provide such answers, coupled with a referral of all such questions to the driver, the government comes dangerously close to deeming suspicious a person's exercise of his or her right to remain silent.  The Court will not permit this result.

Sixth, the government cites the fact that the rental car was overdue as an additional suspicious fact.  The Fifth Circuit has recognized that problems with a rental car's paperwork may give rise to suspicions that crimes are afoot.  *See United States v. Brigham*, 382 F.3d 500,

504 (5th Cir. 2004) (finding suspicious the fact that none of the occupants of a rental car matched the name or physical description of the authorized driver named in the contract). The fact that a rental car is overdue might give rise to the suspicion that the driver is attempting to abscond with it. *See id.* at 509. If the car is possibly stolen, that, along with other suspicious circumstances, might give rise to further suspicions of other potential crimes. *See id.* n.8. While the car's overdue status may have initially aroused Trooper Allick's suspicion, it is evident that by the time he issued the warning for the traffic infraction and proceeded to extend the stop, this fact no longer concerned him. This fact may be inferred from Trooper Allick's returning the various items of paperwork, including the rental agreement, back to Defendant, and voicing no objections to Defendant's continued custody of the car. Unlike the circumstance in *Brigham* where the authorized driver was absent, creating a suspicious circumstance that was never resolved, questions about the status of the rental car were ultimately of little concern in this case. *See Brigham*, 382 F.3d at 509. By Trooper Allick's own behavior, therefore, the overdue rental car was not the basis of any reasonable suspicion.

Finally, the government cites Defendant's nervous behavior as a basis for Trooper Allick's suspicions. The Fifth Circuit has recognized that extreme nervousness on the part of a motorist may contribute to a reasonable suspicion of wrongdoing. *See United States v. Fishel*, 467 F.3d 855, 856 (5th Cir. 2006). Upon a review of the video, it is evident that Defendant did not display much nervousness, if any, in the period before the stop was extended. At an early point in the traffic stop when Trooper Allick ordered Defendant to leave his car and wait by the police car, Defendant can be seen nonchalantly setting himself down on the hood of the police car while Trooper Allick conducted his interviews with the other passengers. Video at 2:00.

Later, when Defendant was inside the police car but not in visual range of the fixed video camera, his voice is discernibly calm and level.

At one or two points in the video, Trooper Allick can be heard remarking that he perceives Defendant to be nervous. In fact, after Trooper Allick returned to Defendant his documents and Defendant denied consent to search, Trooper Allick told Defendant not to "do anything silly" and that Defendant's hands were shaking. Video at 14:06. Trooper Allick later told Deputy Johnson that Defendant exhibited "extreme nervousness" and was "belligerent." *Id.* at 31:41, 31:52. The video, however, supports none of these assertions. Accordingly, this Court questions Trooper Allick's contentions that Defendant exhibited signs of nervousness.

The video shows that any level of nervousness Defendant may have displayed does not come close to the extreme nervousness that is truly suspicious. *Cf. Fishel*, 467 F.3d at 856 ("Fishel gave Purvis his driver license, but appeared extremely nervous with a tremor in his voice. . . . When Purvis asked Fishel if he could search the vehicle, Fishel's legs seemed to fail and he had to brace himself against his vehicle."); *see also United States v. Santiago*, 310 F.3d 336, 342 (5th Cir. 2002) (holding that "nervousness and conflicting statements" did not provide sufficient grounds to extend a traffic stop). Thus, none of the reasons cited by the government justify Defendant's continued detention.

However, there is ample evidence supporting the true but unspoken reason for Defendant's continued detention: Defendant's refusal to consent to a search of the vehicle. After repeatedly informing Defendant that he would only issue a warning for the traffic infraction, Trooper Allick suddenly asked Defendant about possession of illegal narcotics and for consent to search the vehicle. Video at 14:00-14:33. When Defendant refused and Trooper Allick called in

a K-9 dog sniff, he cited refusal to consent as the reason. *Id.* at 14:50 ("I have a vehicle refusal, search refusal."). Tellingly, Trooper Allick cited refusal to consent to search of the vehicle five additional times, for a total of six times. *Id.* at 16:30 (Trooper Allick tells Deputy Johnson that he needs him and his drug sniffing dog there because of a search refusal); *id.* at 16:50 (Trooper Allick told Defendant that he had denied a search request when discussing why he was still being detained); *id.* at 18:40 (while waiting for Deputy Johnson and out of video range, Trooper Allick explained to two others that he had been denied consent to search a vehicle); *id.* at 31:52 (when Deputy Johnson arrived on scene, Trooper Allick informed Deputy Johnson that he has been denied consent to search the vehicle from the outset); *id.* at 42:38 (Trooper Allick told Defendant he may rejoin the others now that he had signed a consent form).

Refusal to consent to a search does not provide reasonable suspicion to justify a stop or continued detention. *United States v. Machuca-Barrera*, 261 F.3d 425, 435 n.32 (5th Cir. 2001) (citing *United States v. Hunnicutt*, 135 F.3d 1345, 1350-51 (10th Cir. 1998) ("[I]t would make a mockery of the reasonable suspicion and probable cause requirements . . . if citizens' insistence that searches and seizures be conducted in conformity with constitutional norms could create the suspicion or cause that renders their consent unnecessary.")); *see also Karnes v. Skrutski*, 62 F.3d 485, 495 (3d Cir. 1995) (holding that refusal to consent to search "cannot support a finding of reasonable suspicion"); *United States v. Gordon*, 917 F. Supp. 485 (W.D. Tex. 1996) (holding officers lacked reasonable suspicion to continue to detain the defendant's vehicle following the defendant's refusal to consent to search his vehicle and that the defendant's refusal to consent to a search of his vehicle could not be turned, by the officers, into a basis for the necessary level of reasonable articulable suspicion).

Furthermore, at one point Trooper Allick told Defendant that he respected Defendant's Fourth Amendment rights. Video at 16:50. However, one cannot respect another's Fourth Amendment rights and simultaneously punish that same person for exercising them. Had the other reasons Trooper Allick claimed after the fact been the true basis for any suspicion he may have had, he would have cited those reasons when explaining the situation during the stop on April 14, 2010. Instead, he referred only to Defendant's exercise of his Fourth Amendment right to refuse consent, and he did so on six different occasions. Accordingly, this Court finds those later-mentioned reasons suspect.

The only other conceivable basis for suspicion of contraband to justify calling in a dog sniffing unit and prolonging the detention arose for the first time at the hearing concerning Defendant's Motion to Suppress. At that hearing, Trooper Allick and Deputy Johnson claimed they found the remnants of marijuana in Nicole Jackson's purse in the back seat. Hearing Tr., 7-8:23-24; 22:9-11. This claim, however, is unworthy of credence, as none of the supposed marijuana remnants were seized, collected, tested, or even mentioned before the hearing. Indeed, after the search, Trooper Allick communicated with his superiors, but never once mentioned smelling the odor of marijuana or finding remnants of marijuana when discussing the possibility and procedure for arresting the three occupants. Video at 57:00. Furthermore, Trooper Allick makes no mention in his roughly forty-eight paragraph report of the incident about the scent of marijuana or finding remnants of it. Hearing Tr., 44:19-45:2.

In light of the totality of the circumstances and the evidence before it, the Court holds that Trooper Allick lacked an articulable factual basis to suspect wrongdoing. His continued detention of Defendant therefore violated Defendant's Fourth Amendment rights.

**D.     Consent to Search**

The Court next considers whether Defendant's signed consent form allowing a search of his vehicle justifies the ensuing search.  The Fifth Circuit has held that consent can render a search lawful under the Fourth Amendment, but that two conditions must be satisfied:  1) the consent was voluntarily given; and 2) it was an independent act of free will.  *See Santiago*, 310 F.3d at 342.

The voluntariness of consent is judged by evaluating the totality of the circumstances.  *United States v. Estrada*, 459 F.3d 627, 633 (5th Cir. 2006).  To determine voluntariness, courts look to (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse consent; (5) his education and intelligence; and (6) his belief that no incriminating evidence will be found.  *Id.* at 633-34.

The first two factors are particularly relevant to the case at bar.  First, Defendant's custodial status was not voluntary.  As demonstrated by Defendant's repeated inquiries into the reasoning underlying his continued detention, Defendant did not choose to remain on site.  Rather, he, Nicole Jackson, and her boyfriend stood on the side of the road in the hot sun at Trooper Allick's request for approximately fifteen minutes until Deputy Johnson arrived.  Video at 17:31-31:41.  Given that Defendant wished to leave, this factor weighs against a finding of voluntariness.

Next, Deputy Johnson engaged in questionable police procedures to obtain Defendant's consent.  First, Defendant was forced to stand in the sun for approximately fifteen minutes while waiting for Deputy Johnson to arrive.  Video at 17:31-31:00.  Second, whereas most of the events

of April 14, 2010 took place in front of the camera on Trooper Allick's patrol car, Deputy Johnson took Defendant behind Trooper Allick's patrol car, out of both video and audio range, while attempting to gain signed, written consent to search the vehicle. *Id.* Deputy Johnson admitted that he had problems with his video, Hearing Tr., 28:11-12, yet despite that knowledge he decided to take Defendant out of video and audio range instead of in front of the camera in Trooper Allick's patrol car, where most of the other events took place. This Court finds this act both deliberate and suspect, as Deputy Johnson appeared to evade the very monitoring and accountability video cameras are installed to provide.

Furthermore, "[a] consent is suspect if given by one who earlier refused to consent, unless some reason appears to explain the change in position." *United States v. Buckingham*, 433 F.3d 508, 514 (6th Cir. 2006) (citing Wayne R. LaFave et al., *Criminal Procedure* § 3.10(b) (2d ed. 1999)); *United States v. Castle*, No. 3:05CR-99-S, 2006 WL 1669874 at *14 (W.D. Ky. June 12, 2006); *see also United States v. Dortch*, 199 F.3d 193, 202 (5th Cir. 1999); *United States v. Pulvano*, 629 F.2d 1151, 1157 (5th Cir. 1980) (prior refusals to consent are a factor in evaluating voluntariness). Defendant had previously refused consent, and the government, Trooper Allick, and Deputy Johnson offer no reason to explain the sudden change. Indeed, after saying, "man, let me sign this," Defendant can be heard continuing to question what was happening for at least five additional minutes. Video at 38:09-42:38.

Defendant contends Deputy Johnson threatened to impound Defendant's vehicle should he again refuse consent to search. Hearing Tr., 28:25-29:2. Given the fact that Defendant was forced to stand in the sun for fifteen minutes, Deputy Johnson's choice to attain consent out of both video and audio range knowing that his video unit had problems but that Trooper Allick's

was functional, Defendant's continuing to question what was happening after supposedly consenting to the search, the lack of explanation for Defendant's electing to grant consent after initially refusing, and the questionable police procedures employed, this Court finds Defendant's consent to be involuntary.

Further, consent, to be valid, must also be an independent act of free will. To determine "whether the consent was an independent act of free will, and, thus, broke the causal chain between the consent and the illegal detention, the Court must consider: 1) the temporal proximity of the illegal conduct and the consent; 2) the presence of intervening circumstances; and 3) the purpose and flagrancy of the initial misconduct." *Jones*, 234 F.3d at 243. In the instant case, the consent overlapped with the illegal conduct, namely the illegal prolonged detention, and there were no intervening acts to separate the consent from the prior illegality. *See id.* (finding a close temporal proximity existed because the illegal detention continued up to the time of the defendant's consent ); *Dortch*, 199 F.3d at 202 (finding a close temporal proximity because the illegally prolonged detention continued until the officers sought the defendant's consent to search his person a third time). Considering the questionable nature of the consent discussed above, the consent cannot be considered an intervening circumstance sufficient to attentuate the taint from the prior Fourth Amendment violations. *See United States v. Chavez-Villarreal*, 3 F.3d 124, 128 (5th Cir. 1993) (finding no intervening circumstance and no dissipation of taint from prior illegality even though the defendant was told he could refuse consent because refusal seemed pointless). Here too, Defendant's refusal seemed pointless, as his prior refusals to consent resulted in continued detention, coercive tactics, and repeated requests for consent until he finally relented, after approximately forty minutes of detention.

Finally, the purpose and flagrancy of the initial misconduct is cause for concern. Trooper Allick and Deputy Johnson's actions betray a fishing expedition that would not end until incriminating evidence was found. Therefore, the consent is involuntary and thus inadmissible. Even if it were voluntary, it is the fruit of the poisonous tree with no attenuation of the taint from the preceding illegality. As such, it should be properly excluded. *See Wong Sun v. United States*, 371 U.S. 471 (1963); *United States v. Martinez,* 486 F.3d 855 (5th Cir. 2007).

### E.     Probable Cause for Search

Finally, the Court must resolve whether Trooper Allick and Deputy Johnson had probable cause to search Defendant's car, which would validate the search independent of the consent. *See* Reply 2. It is settled law that a police officer may search a car without a warrant and without consent if probable cause exists to believe it contains contraband or evidence. *See United States v. Saucedo-Munoz*, 307 F.3d 344, 351 (5th Cir. 2002) (citing *Maryland v. Dyson*, 527 U.S. 465, 466-67 (1999)). The government contends that probable cause existed in this case because a non-intrusive dog sniff yielded an alert to the car's exterior. *See* Reply 2.

Deputy Johnson, while discussing his drug sniffing dog, explained that his dog alerts by sitting. Hearing Tr., 19:17-18. However, Deputy Johnson, while describing generally how other dogs alert, claimed that his dog also alerts by salivating and breathing in through his nose and that his dog did so on April 14, 2010. Hearing Tr., 20:2-4. But the sniffing dog began the search already excited with his tail wagging and breathing accordingly. Video at 43:30. After the search, the dog walked away from the vehicle. *Id.* at 43:51. Deputy Johnson then led the dog back to the left front of the vehicle, opened the door, and entered. *Id*. At all relevant times, there was no discernible change in the dog's behavior while sniffing the vehicle. The video clearly

shows that Deputy Johnson's dog never sat throughout the sniff of the car, which is what the Court was told this dog was trained to do when he alerted, nor is there any indication of the dog inhaling differently than normal or salivating from his mouth. This Court therefore questions Deputy Johnson's claim that his dog alerted.

But even if the dog had alerted, given the prior illegal prolonged detention, any evidence produced by a subsequent search is the fruit of a poisonous tree and is inadmissible. *See Martinez*, 486 F.3d at 864. Subsequent statements are similarly tainted, and as such are properly excluded.

### III. CONCLUSION

Trooper Allick and Deputy Johnson's statements pertaining to the events that occurred on April 14, 2010, are wholly inconsistent with what is contained in the Video. More importantly, their actions violated Defendant's Fourth Amendment rights. For the foregoing reasons, Defendant's Motion to Suppress Evidence and Statements and Supporting Memorandum is **GRANTED**.

**SO ORDERED**.

**SIGNED** on this 13th day of October, 2010.

_____
KATHLEEN CARDONE
UNITED STATES DISTRICT JUDGE